I want to reserve three minutes for about a minute, and the first, the first post, I'd like to pull up the order of presentation and discuss briefly the evidence that you first filed, and then move back into the summary presentation. The standard on the evidence set by the Supreme Court's decision in the 1960s about other acts or acts of violence or other victims of discrimination that used to be weighed by a post-employee evidence, used to be claims theory or circumstances. What's happening here is that the verdict is very accomplished by an act of error because the ruling on the Bonnells, which is an introduction, she, and she found all of the anecdotal evidence on the ground that was accumulated, and potentially would waste time, but those entire statements are for, is a random mix, and so we didn't get much of an analysis or any findings of both the three anecdotal evidence to offer, and we also proved, in fact, what is required for a time, or would, in fact, in this way, under Obey v. Johnson, establish that there is so much wealth, and trust, and abuse, and suppression, and slander, and hurt, and shifts, established based on harmless characters. Here, the principal liability issue presented for 10 days' time was whether or not there was any fair and neutral peer review process. The best evidence, the plainest evidence, was that there were other people who were exposed to retaliatory peer reviews, and she was prepared to present three at a time, but they were excluded. The problem here, for Dr. Romero, is that the result of that trial was very unbalanced, because it sounded like you had a conflict of interest. And it says plenty about Dr. Romero's performance in the city, in the hospital, and about certain cases he worked on, but he never got to hear about the process itself, except on business cases. Dr. Gallagher, the medical director, was allowed to testify that all the doctors were being reviewed in 2011. That's the trial transcript, pages 379 and 405. She testified that she reviewed herself at 357. Dr. Moore is one of the defendants, was allowed to testify that there was a big increase in peer review. Of course, she will be reviewed. That is 111.3 in the trial transcript. Dr. Shearing never made it yet to the Chair of the Peer Review Committee. She testified that Hughes, Smear, Dolikoff, and Romero, all doctors were friends, but spoke by the process. That's 441. So, the attorney gets to hear all of these things, but they don't get to hear any referrals to Dr. Romero. In fact, it's very interesting. It's funny because Drs. Hughes, Smear, Dolikoff, and Mr. Romero, and Dr. Romero, they all testified. They want things to Dr. Moore's writing. These are the very individuals that were threatened by the process, but they were allowed to testify behind the law. They weren't being threatened. And so, under Obrey, we should assume that this relevant and very important evidence shouldn't be heard by the jury. So, now we get to the technical side of things. So, there are a few important things to bear in mind when looking at the issue here. Is that at some point, the hospital felt that it was over its hands, and since then, and for yearly journalism, and probably during the war, the process was deeply discovered in practice, in reading cases. And it didn't seem to end, because Judge Silk just became the head of the Department of Sociology, and after a year of possible working with Dr. Romero, Judge Silk said, we're going to be on board to finish this. And the only explanation that's ever offered is a loose re-statement by Judge Silk, repeated several times, that Obrey has taken the promise. But there's no evidence of scarcity promise. There's no objective evidence. Mr. Romero doesn't say so. The thing that's being raised now, I'm afraid, is that Judge Silk, who was sort of the head of the Department of Sociology, but there's no record of this, is that there's something in which Dr. Romero was sworn, as opposed to the recent re-statement, was in a secret jury, and also in his request for any matters of logical and possible detention, as to what mechanism, in my opinion, or kind of an extension of what it means to be able to work. Well, what we have is, you know, that this case was also a year later, in November of 2004, and Dr. Romero was the head, and we spent at least a year of this case, and then another month, in order for him to be able to come to his senses, was when people had to face a meeting in January, when the doctor had just filed a petition, so he had a meeting in January. It was his first attempt, and Dr. Romero was in a space when he returned, was in a meeting with the department, and now he's on his way to file a petition, so it was a month's extension, which resulted in the moment that he was to say no more, which was a statement to all that is possible. One of the next things we're going to be talking about is whether or not Dr. Romero had any kind of guarantees. All you would have to invest is a liability subsection. And that's where we tell you if there was any guarantees. That's right, John. You pick up the paper, and the suggestion was that you can transition what's known as career work, from Stanford College, where you show up for PhDs. This was what the record says, was to enable you to warm up and get back into the civilian grounds. The doctor was in a terrible state of recovery, and it indicated that going back to work instead of going to college would have been stressful because of various circumstances. But this was the hopeful sign in the letter that she said, let's bump the mean a month. And I imagine it's the therapist's fault that she wouldn't be able to return a message that didn't suggest such a specific standard of compensation. So, the other issue, and there's several issues decided in the post. One issue is whether the specialty is a reasonable accommodation. Right at the beginning of the process, a year or a year before the determination in the summer, she was modeling to engineers to begin to get notifications for what accommodations were possibly being prepared in the summer, so that they could continue. And at the time, it was kind of a square peg in Ralph's situation because she was actually on leave to not be in this informal accommodation in the workplace. The accommodation wasn't the future. So, the forms were really ineptly prepared for that issue. But in the end, the professors seemed to understand that the accommodation was leaving to the extent that several times Ralph's doctors had requested. And all they were able to reach is a year, a year or so of sleep time security. So, again, no more assumptions and no explanation about why. And at this point, did he suggest any other accommodations that he was going to try to work with in law school? Well, for a start, I believe the accommodation was to be the only accommodation to request sleepless nights. Okay, the key is, he never, he never said that he was going to continue with the accommodation for two or three years. And then, as you mentioned, that's what he has done over the course of his career. Okay. I want to start from there. So, the accommodation for him was to be able to make a recovery from PTSD and anxiety. But, throughout the process, his doctors, his therapist, and his lawyer all submitted letters to the hospital. I believe they got those forms at the same time, even when he was doing, whenever he was retiring. But, the hospital let them know that he still must be able to return to work. And so, don't look for something that you really can't manage. His own network was very highly elevated. There were no complaints against his accommodation either during the process. Okay. The employer has control over this process of creating the, the education of their patient. And so, it's important that we talk about the PTSD and the rest of the medical services that they have. At the beginning, when these forms were being sent to, to Dr. and to Dr. Rivera, the problem was that they said that this can't be processed because they was waiting even to come back from the surgery. And, and that's why when he was out, that was really not the right question. It was not the issue. He was not participating in talking to the hospital. And certainly, in the, in the, in the, in the, in Dr. Miranda's medical encounter,  asking specifically for their extra funds against the accommodation. So, they did approach the hospital about their locations and their accommodation. Okay. Yes. Yes. Yes. At the very least, the hospital was a new area where they were considering the cost of accommodation. They either said it was such a big amount that this would not exist, or they could have said we can't rent an accommodation for these reasons to be able to start preparing to respond. But that's where things got hard. Doctors said she has psychosis and no divorce and she's not even living there anymore. But there was a major improvement. Good morning. My name is Wilma Tadjianopoulos. I'm the representative of the County of Santa Clara Health and Rehabilitation Department. The party in the great of the county recently nominated Dr. Philip who has graduated more materially from this position in the AAC and the AAC is the state of California and has been  for over a year. The county terminated Dr. Rivera's appointment on December 3rd, 2012, which was the prior year, and county executive director of the  and the  department in   of California. The AAC has been in the county since 2012. This is the county executive director of the department. Since 2005, the county has been working on these activities. During all of this information, the county notified the district members in 2012 that if these were not in place,  would not be able to participate in these activities. The county has notified the district members in 2012 that if these were not in place, they would not be able not in place, would  be able to participate 2012 that if these  not in place, would   place,  be able to participate in these activities. The county has notified the district members in 2012 that if these not in place, would be able to participate  these activities. district members in 2012  if these not in place,  be able to participate these activities. The county has notified the district members in 2012 that if these not in   be able to participate in  activities.  county has notified the district members in 2012 if these not in place, be able to participate in these activities. county has notified the district members in    these not in be able to participate these activities. county has
judges: Thomas, Bea, Ikuta